Green, Judge,
delivered the opinion of the court:
The material facts in this case are not at all complicated. At the close of the World War the Government had on hand an enormous quantity of surplus military supplies in the form of canned goods which had been purchased for' the Army, including bacon, corned beef, and corned-beef hash, and was desirous of selling these surplus stocks as speedily as possible. It was a matter of common knowledge that the longer these supplies were kept the smaller the price which was likely to be obtained. Realizing this fact, Congress by the act of July 11, 1919, authorized the Secretary of War to sell these supplies “ to any corporation or individual upon such terms as may be deemed best.” Pursuant to this authority the War Department, through proper officials, issued a circular giving prices and terms upon which these canned goods would be sold," and plaintiff, which had 2,150 stores for the sale of provisions, on September 21, 1920, purchased 120,000 cans of corned-beef hash and 30,000 cans of bacon, making a total purchase amounting to $103,500.
In November of the same year the War Department, finding that these canned goods were not moving as rapidly as was desirable, issued another circular giving prices and terms thereon lower and more favorable than those of the circular first issued. Shortly after this new price list had been issued the Quartermaster General announced that “ on all canned meats ordered and paid for but not shipped, adjustment with customer will be made on the basis of new prices, discounts, and terms of shipment.” On November 15, 1920, of the 120,000 cans of hash purchased, 33,600 cans had been delivered to the plaintiff and sold by it and the remaining 86,400 cans the plaintiff had not received or had not disposed of. Of the 30,000 cans, of bacon purchased, 13,200 had reached the plaintiff but none of it had been resold. The plaintiff having paid for the entire order of the corned-beef hash, the War Department, therefore, in accordance with the policy announced by the Quartermaster General, refunded to the plaintiff $5,875.20. Of the bacon ordered, the plaintiff having paid for 13,200 cans, the War Department gave the plaintiff credit for $3,378.89, of which amount *135 $2,911.20 was refunded to the plaintiff. On March 8, 1921, there still remained undelivered to the plaintiff 16,800 cans of bacon. On that date the plaintiff requested permission to purchase in lieu of the undelivered bacon an amount of corned beef exceeding the. quantity and value of the bacon ordered. This proposition of plaintiff was accepted by the Government officials and the order for the bacon was canceled. The plaintiff paid for this corned beef in accordance with the agreement, and the transaction for the time being was closed.
Five years later the plaintiff sold to the defendant a large quantity of butter pursuant to a contract which it fulfilled. When, however, the matter of payment arose the Government withheld therefrom $22,106.44, which it still withholds, and has further demanded of the plaintiff an additional sum of $7,148.56, which the plaintiff has not paid. The cause of this action on the part of the Government is found in a ruling of the Comptroller General, who held that the action of the Quartermaster General and the War Department in modifying the original contracts made by the plaintiff with the defendant for the purchase of canned goods was unauthorized and void by reason of which the amount withheld and the additional sum demanded became due from the plaintiff to the defendant. The question in the case is whether this ruling was correct.
So far as the transaction is concerned whereby a portion of the order for bacon was canceled and in lieu thereof an order for an amount of corned beef exceeding in quantity and value the order for bacon, it is quite clear there was a consideration for this new contract. Plaintiff gave up its right to demand bacon from the defendant and the defendant canceled the order for bacon and accepted instead an order for corned beef larger in quantity and value. There can be no doubt but that the War Department had the authority to so act.
With reference to the refunds made to the plaintiff after the issuance of the circular of new price lists and discounts, the question is more difficult, although it must be said if it related to the power of a selling agent of a concern engaged *136 in the wholesale business there would not be the slightest question as to his authority to make the refunds under the same circumstances.
It becomes necessary therefore to determine what power had been granted the Secretary of War by the act of Congress.
Congress had authorized the Secretary of War to dispose of the surplus property “ upon such terms as may be deemed best.” This authority is very broad. We think it meant that he might dispose of this property in such a manner as he considered was for the best interest of the Government. Support will be added to this construction if we consider the action of the Secretary of War in the light of the surrounding circumstances and the emergency which had arisen.
Congress must have known that there was an enormous amount of these supplies on hand and that they must be sold with reasonable dispatch, for the longer they were kept the less would be obtained for them, but the Government had no organization properly equipped to dispose of these' goods to the consumer. If disposed of, they must be sold through large selling organizations such as the plaintiff had with its over 2,100 stores. Also, we think it was apparent to Congress that the supplies must be sold in accordance with the custom of the trade in disposing- of such products, and it was intended they would be so sold where such customs were. in the interest of the Government. Selling agents of large wholesale concerns who are endeavoring to dispose 'of large quantities of goods within a comparatively brief period in case of a change in prices and discounts usually give to their customers the benefit of new prices and discounts upon unsold goods purchased under the former rates. But even if it can not be said that the court can take judicial notice of such a practice, it is quite evident that it was to the interest of the Government to follow it under the circumstances before us. The Government still had on hand great quantities of • these canned goods which were not being disposed of as rapidly as was desired. No one knew what changes might be made in the Government’s price list in order to bring about the sale of these goods. If those considering purchases *137 understood that changes might be made giving lower prices and discounts than those under which they bought, thus not only depriving them of any chance of profit but making a loss probable, it is obvious that all purchasers would hold back to the last day in order to get the lowest prices. The Government could not hope to dispose of these supplies if it discouraged future purchasers by failing to deal fairly with those who had already purchased. It was therefore clearly ■ to the interest of the Government to make the refunds on the unsold goods which were either in the hands of the plaintiff or which had not been shipped but had been paid for. In so far as this applied to the goods that were not shipped, it was merely a cancellation of an unfulfilled contract. The findings, however, show that some of the supplies upon which refunds were made had been actually delivered to plaintiff and payment made therefor.
Neither of the original contracts, however, had been completely carried out. Was the War Department authorized to cancel these contracts and make the refunds? The question is not free from doubt, but on the whole we think it was.
Our attention has been called to the case of the American Sales Corporation v. United States, recently decided by the Circuit Court of Appeals for the fifth circuit, as an authority for holding that the defendant is not liable. The facts and circumstances of that case were quite different from those in the case at bar, and we are compelled to decline to follow the doctrine 'laid down therein as applicable to the questions under consideration in the instant case.
Numerous authorities can readily be found and cited which hold that where an agent is authorized to make a sale of a particular parcel of property, such as a tract of land or an article of personal property, he has no authority to revoke or rescind the sale and receive back the goods which he had previously sold or alter his contract in any material point, but, as is said in 2 C. J. 609, section 243:
“A general agent with full authority to represent the principal in a given locality, or to manage a particular branch of the principal’s business, is more than a mere sales agent, and where the conduct of his agency reasonably requires power to modify the contracts he makes, courts have often held the right so to do to be within his implied powers.”
*138 We think the Secretary of War was “ more than a mere sales agent.” His power extended to the disposition of this great amount of property which must be sold in a great number of different parcels and lots, and we think that the circumstances of the case were such that the proper “ conduct of his agency reasonably requires power to modify the contracts he makes.” The Secretary of War was appointed the agent of the Government not merely to sell the goods included in the purchase made by plaintiff but all the vast quantity of surplus supplies which, to avoid deterioration, must be quickly sold. If a modification of a contract was in the interest of the Government, we think he had power to make such a modification, especially when the contract had not been entirely carried out, which was the situation in the case at bar. There are numerous cases which hold that the Secretary of War' or the Secretary of the Navy may cancel contracts which he has made if such cancellation is in the interest of the Government, even though the authority conferred upon him so far as the language of the statute is concerned is only to make and execute contracts. It is true that in these cases there was something in the nature of a settlement or there was some consideration passing between the contractor and the Government, yet in most of them the controlling feature that led the court to conclude that the Secretary had power to make a new contract was that the action was in the interest of the Government and that such authority would be implied notwithstanding it was not expressly granted by the statute conferring it.
While the Government received, as we think, a benefit as a result of carrying on its business in a fair and equitable manner and making refunds which were morally although not legally due the plaintiff, the benefit was not one which passed from the plaintiff, and consequently could not be considered a consideration. If the transaction of the refunds is to be sustained at all, it must be on the ground that the Secretary of War had the broad power of a general sales agent acting for a large mercantile concern not only to make contracts but to modify them in order that he might better execute in the interest of his principal the general powers -which had been given him. If the Secretary of *139 War did not bave this power, he was seriously hampered in the conduct of the public business. We think that Congress intended by the broad language of the statute conferring authority upon him to authorize the modification of contracts for the sale of these supplies when he “ deemed ” it “ best ” for the public interest.
It follows that the plaintiff is entitled to recover the full amount claimed, and judgment will be rendered accordingly.
Sinnott, Judge, and Booth, Ghief Justice, concur.
Geaham, Judge, took no part in the decision of this case, and Moss, Judge, took no part on account of illness.